## HOWARD *v.* BISHOP BYRNE COUNCIL HOME, INC.

[No. 139, September Term, 1967.]

*Decided March 7, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SINGLEY, JJ.

*Martin E. Gerel* for appellant.

*Gilbert R. Giordano,* with whom was *Gary R. Alexander* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

Again this Court is asked to overthrow the long established doctrine of immunity of charitable organizations from tort liability, for the reasons that it remains an anachronism, a slave of *stare decisis,* a source of wrongs committed without a remedy, and against the "weight" of modern authority. These arguments have all been presented before this Court at some time or another, and, of course, have been found not persuasive. However, since our last review of this subject in 1959, a wealth of recent authority, both in favor of and opposed to charitable immunity, has developed; it appears timely to again discuss the question in light of both the established Maryland policy and the respected authorities from our sister states.

Appellant Russell G. Howard was employed as a laborer by Harris & Brooks, Inc., which had contracted with the appellee to participate in the clearing of a lot owned by the appellee in Oxon Hill. Evidently the appellee expected to construct a building on the lot, but the record remains silent as to the exact nature of the intended building. On April 7, 1966, the appellant was seriously injured when struck by a falling tree which had been cut by an employee or servant of the appellee. Suit was filed, and the appeal is taken from the action of the lower court sustaining the appellee's motion raising preliminary objection to the appellant's declaration. The appellant concedes that the appellee is a charitable, non-profit corporation.

The Maryland law of charitable immunity is familiar to most attorneys, since it has as its root one of the first cases in the

United States to decide the issue. Almost all authorities which undertake a detailed analysis of this aspect of tort law, especially those decisions which abrogate the doctrine, have noted that *Perry v. House of Refuge,* 63 Md. 20 (1885) and *MacDonald v. Massachusetts General Hospital,* 120 Mass. 432 (1876) were both based on English cases which had been overruled as early as 1866. The *Perry* case adopted the "trust fund" theory of immunity on the authority of the Massachusetts case, and Lord Cottenham's statement in *Feofees of Heriot's Hospital v. Ross,* 12 Clark & Fin. 507, 513, 8 Eng. Reprint 1508, 1510 (1846), that:

> "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose."

Both Massachusetts and Maryland appeared nonconversant with the fact that the English case had been overruled by *Foreman v. Mayor of Canterbury,* [1871] L.R. 6 Q.B. 214, following the rule in *Mersey Docks v. Gibbs,* [1866] L.R. 1 H.L. 93.

The second case to reach the Court of Appeals was *Loeffler v. Sheppard-Pratt Hospital,* 130 Md. 265, 100 A. 301 (1917). After distinguishing the three theories used to justify charitable immunity (trust fund, *respondeat superior* and implied consent), this Court stated that the trust fund theory was "firmly established law in Maryland." Thirty years later the Court decided *Howard v. South Baltimore General Hospital,* 191 Md. 617, 62 A. 2d 574 (1948), the first Maryland case involving a patient at a non-profit hospital. A number of states have distinguished between the functions and financial posture of a non-profit hospital on one hand and a religious or eleemosynary institution on the other. As will be seen shortly in this opinion, this distinction has led to somewhat contradictory results whereby in some states immunity has been granted, and in others immunity denied, *because of* the fact that the particular defendant was a hospital. In *Howard,* however, the Court made no such distinction, but instead articulated the first of several statements to the effect that to withdraw immunity would be an

act of judicial legislation in the face of both strong public policy and a legislative expression to the contrary.

This reference to the Legislature opened a discussion on the history of what is now Code 1957, Art. 48A, § 480 (1964 Repl. Vol.). This Court noted that in 1947 the General Assembly declined to enact House Bill 99, which would have estopped any charitable institution from pleading immunity as a defense to a tort claim. Instead, it adopted the Senate version (S.B. 411), which estops a liability insurer from setting up the charitable immunity of the insured. That became Art. 48A, § 85 of the Code, repealed and reenacted as Art. 48A, § 480 by Chapter 553, Laws of Maryland 1963. The Court in *Howard* and later cases made it plain that the Legislature had broached the entire problem, and had resolved it in its own manner. "* * * the Legislature may well have had in mind the fact that, except to the extent of the premium voluntarily paid, there would be no invasion of the trust funds, upon which the rule of immunity was largely predicated." *State v. Arundel Park Corp.*, 218 Md. 484, 488, 147 A. 2d 427 (1959). See also *Gorman v. St. Paul Fire & Marine Ins. Co.*, 210 Md. 1, 121 A. 2d 812 (1956) ; *Thomas v. Prince George's County Commissioners*, 200 Md. 554, 92 A. 2d 452 (1952). Most recently, in *Cornelius v. Sinai Hospital of Baltimore*, 219 Md. 116, 148 A. 2d 567 (1959), the Court, *per curiam*, restated its firm adherence to the settled Maryland rule granting immunity, but left the door open for the Legislature to step in should it sense the demand or desire. To date, the rule of *Perry v. House of Refuge, supra*, stands, tempered only by statutory provisions directed to the insurer (Art. 48A, § 480) and Art. 43, § 556A (1965 Repl. Vol.), which will be discussed shortly in this opinion.

With the Maryland law thus established, we now focus on what the appellant calls the "overwhelming body of judicial reasoning" abolishing the rule. Certainly, the reports are replete with decisions on point. However, a comprehensive review in this opinion would only serve as a repetition of the compilations found in several authorities. See, *e.g.*, Justice Rutledge's landmark opinion in *President and Directors of Georgetown College v. Hughes*, 130 F. 2d 810 (D. C. Cir. 1942) ;

*Rabon v. Rowan Memorial Hospital, Inc.*, 152 S. E. 2d 485, 496-498 (N. C. 1967) ; *Flagiello v. Pennsylvania Hospital*, 208 A. 2d 193 (Pa. 1965) ; Prosser, *Torts* § 127 (3d Ed. 1964) ; Annot. 25 A.L.R.2d 29 (1952). After studying these authorities, as well as the more recent rulings in other states, we cannot conclude that Maryland is still attempting to breathe life into a dead law. What is indicated, however, is that of the forty seven states to decide the question,[1] less than one-half (twenty) have *completely* abandoned charitable tort immunity.

Eight states agree with Maryland that, as a matter of public policy, eleemosynary institutions should be immune from liability to tort claimants, either on the theory that the charitable assets are placed in trust for charitable purposes,[2] or that the doctrine of *respondeat superior* does not apply to religious or charitable organizations.[3] Two of these states, Missouri [4] and South Carolina,[5] have even gone so far as to rule that a charitable corporation may set up its immunity even though it carries liability insurance.

At the other end of the spectrum are the twenty states and the District of Columbia which have in effect totally abandoned charitable immunity, and now hold all such institutions amenable to suit, and their property subject to attachment.[6]

---

1. Hawaii, Mexico and South Dakota have neither decided the point judicially, nor treated it by statute.

2. Webb v. Blount Memorial Hospital, 196 F. Supp. 114 (E. D. Tenn. 1961); Helton v. Sisters of Mercy of St. Joseph's Hospital, 351 S. W. 2d 129 (Ark. 1964); Hemenway v. Presbyterian Hosp. Ass'n of Colo., 419 P. 2d 312 (Colo. 1966); Rhoda v. Aroostook General Hosp., 226 A. 2d 530 (Me. 1967); Harrigan v. Cape Cod Hosp., 208 N. E. 2d 232 (Mass. 1965); Schulte v. Missionaries of La Salette Corp. of Mo., 352 S. W. 2d 636 (Mo. 1961); Decker v. Bishop of Charleston, 147 S. E. 2d 264 (S. C. 1966).

3. Watkins v. Southcrest Baptist Church, 399 S. W. 2d 530 (Texas 1966).

4. Schulte v. Missionaries of La Salette Corp. of Mo., 352 S. W. 2d 636 (Mo. 1961).

5. Decker v. Bishop of Charleston, 147 S. E. 2d 264 (S. C. 1966).

6. Nevada: N.R.S. 41:480; President and Directors of Georgetown College v. Hughes, 130 F. 2d 810 (D.C. Cir. 1942); Tuengel v. City of Sitka, Alaska, 188 F. Supp. 399 (D. Alas. 1954); Ray v. Tucson Medical Center, 230 P. 2d 220 (Ariz. 1951); Malloy v.

Most jurisdictions, however, are reluctant to totally withdraw immunity, and, therefore, they set up important distinctions. As a consequence, we discover that in most states, liability will depend on the type of negligence, the function of the charitable institution at the time of the injury, the presence of liability insurance or any combination of these factors. For instance, in Nebraska, charitable hospitals are not immune to suit by a patient for negligence, but liability is limited to the effective insurance coverage. *Myers v. Drozda*, 141 N. W. 2d 852 (Neb. 1966). To this extent, the rule is similar to Maryland. See Code 1957, Art. 43, § 556A (1965 Repl. Vol.). Both Arkansas [7] and Maine, [8] which were previously cited as retaining total immunity, also provide by statutes similar to Maryland that a charitable institution may be liable to the extent of its effective insurance coverage. Georgia has held that a liability policy represents a non-charitable asset which may support a cause of action. [9] And in a recent case, the Supreme Court of Indiana withdrew immunity from hospitals but expressly de-

Fong, 232 P. 2d 241 (Calif. 1951); Durney v. St. Francis Hosp., Inc., 83 A. 2d 753 (Del. 1951); Suwannee County Hosp. Corp. v. Golden, 56 So. 2d 911 (Fla. 1952); Bell v. Presbytery of Boise, 421 P. 2d 745 (Idaho 1966); Neely v. St. Francis Hosp. & School of Nursing, 391 P. 2d 155 (Kan. 1964); Mullikin v. Jewish Hospital Ass'n, 348 S. W. 2d 930 (Ky. 1961); Miller v. Macalester College, 115 N. W. 2d 666 (Minn. 1962); Mississippi Baptist Hospital v. Holmes, 55 So. 2d 142 (Miss. 1951); Dowd v. Portsmouth Hospital, 193 A. 2d 788 (N. H. 1963); Bing v. Thunig, 143 N. E. 2d 3 (N. Y. 1957); Gable v. Salvation Army, 100 P. 2d 244 (Okla. 1940); Hungerford v. Portland Sanitarium & Benevolent Ass'n, 384 P. 2d 1009 (Ore. 1963); Flagiello v. Pennsylvania Hospital, 208 A. 2d 193 (Pa. 1965); Foster v. Roman Catholic Diocese of Vermont, 70 A. 2d 230 (Vt. 1950); Friend v. Cove Methodist Church, Inc., 396 P. 2d 546 (Wash. 1964); Adkins v. St. Francis Hosp. of Charleston, West Virginia, 143 S. E. 2d 154 (W. Va. 1965); Widell v. Holy Trinity Catholic Church, 121 N. W. 2d 249 (Wis. 1963).

7. 6 Ark. Stat. Ann. § 66-3240 (1966 Repl. Vol.), grants direct action against the insurer. See Ramsey v. American Automobile Ins. Co., 356 S. W. 2d 236 (Ark. 1962).

8. 14 M.R.S.A. § 158 (effective Feb. 8, 1966), estops both the charitable institution and the insurer from setting up the immunity. See Rhoda v. Aroostook General Hospital, 226 A. 2d 530 (1967).

9. Morehouse College v. Russell, 135 S. E. 2d 432 (1964).

clined to decide whether the doctrine of charitable immunity existed in that state. It did, however, recommend that the state legislature take action to authorize the purchase of liability insurance by charities, limiting liability to the amount of the coverage.[10]

We note that Indiana and Nebraska are just two of several states, perhaps the majority of states, that treat hospitals as a separate class of charitable institutions. As noted above Maryland also draws the distinction by statute. The reason for separate treatment was well summarized by the Supreme Court of Appeals of West Virginia in *Adkins v. St. Francis Hospital of Charleston, West Virginia*, 143 S. E. 2d 154, 158 (W. Va. 1965):

> "In the early days of our society hospitals bore the true character of charitable institutions. They were a haven for the indigent ill, lame and disabled. The expense of their operation and maintenance was, for the most part, borne by contributions from charitably inclined citizens. The indigent rarely paid for services rendered to him. Charity in its true sense prevailed.
>
> "Today the concept of the hospital has changed materially. The worn, run-down accommodations have been replaced by modern buildings of brick, glass and steel. No longer are they reserved for the indigent ill, but are available to and are commonly used by people of all economic levels. They are staffed by trained physicians, surgeons, nurses and other employees. Available therein is the finest equipment devised by medical science. All of this is for the benefit of the patient. However, as heretofore noted, the modern hospital operates on a businesslike basis and, in that stature, must be responsible for all of its obligations." [11]

Prior to the above case, West Virginia had followed the rule

---

10. Ball Memorial Hospital v. Freeman, 196 N. E. 2d 274 (1964).

11. North Carolina is another state which has just recently abrogated the doctrine which it formerly applied only to beneficiaries of the charitable services. See Quick v. High Point Memorial Hospital, Inc., 152 S. E. 2d 527 (1967).

presently enforced in Virginia that all eleemosynary institutions are liable for their own torts, but hospitals were excepted, so long as reasonable care was exercised in the selection of staff and employees. See *Roanoke Hospital Ass'n v. Hayes*, 133 S. E. 2d 559 (1963).[12] Virginia bases this rule on "public policy," apparently with the thought in mind that hospital procedures are accompanied by a certain element of danger, and patients would take advantage of this situation to deplete the limited funds of the hospital. One might characterize this as a coalescing of the trust fund and the implied consent theories of immunity. We do not necessarily support nor do we condemn this reasoning. However, we note with interest that at least two states *reinstated* hospital immunity *by statute* shortly after their respective high courts abandoned the charitable immunity doctrine,[13] whereas at least two other jurisdictions *originally* withdrew immunity from hospitals and only later did they abrogate the rule completely.[14] Finally, we recognize that several

12. The rule in Louisiana is similar. Humphreys v. McComiskey, 159 So. 2d 380 (La. App. 1964). However, the state insurance code provides for direct action against the insurer. La. R.S.A. 22-655. And it has been held that an insurer may not raise a defense personal to the insured. Hill v. Eye, Ear, Nose & Throat Hosp., 200 So. 2d 34 (1967).

13. See Noel v. Menninger Foundation, 267 P. 2d 934 (Kan. 1954), which was followed in 1959 by K.S.A. 17-1725, which gave the property of charitable hospitals immunity from attachment or collection except from governmental or contractual debts. The statute was held to be unconstitutional in Neely v. St. Francis Hosp., 391 P. 2d 155 (1964). The other state is Rhode Island. In the recent Pennsylvania case of Flagiello v. Pennsylvania Hospital, 208 A. 2d 193 (1965), Justice Musmanno noted that "Rhode Island, a state * * * with a wisdom and courage in inverse proportion to its geographical size, declared that a maltreated hospital patient was entitled to recover for damage done him." This reference was to Glavin v. Rhode Island Hospital, 12 R. I. 411 (1897), apparently the first American case to reject the immunity doctrine. Unfortunately, the Penslyvania Court did not mention the fact that, in 1896, Rhode Island passed G.L. 7-1-22, removing *respondeat superior* as a source of hospital liability. See Fournier v. Miriam Hospital, 175 A. 2d 298 (R. I. 1961).

14. Washington: Friend v. Cove Methodist Church, Inc., 396 P. 2d 546 (1964) extended the rule of Pierce v. Yakima Valley Me-

decisions have on the surface imposed liability upon all charitable and religious institutions where, in fact, the cases involved the extension of *respondeat superior* to charitable hospitals.[15] One might well argue that the liability of a charitable institution, such as a church, to one not a beneficiary of the charity, such as a workman, is still an open question in those jurisdictions.

By reading the cases cited, plus numerous earlier decisions, the inescapable conclusion is reached that both imposition and abrogation of the immunity doctrine are products of specific circumstances. There is no universal sentiment charging charitable tort immunity to be unconscionable, a state subsidy to religious organizations or a deprivation of equal protection of the laws. Where states have chopped away at the doctrine, it has mostly been by processes of attrition and piecemeal adjudication, often accompanied by legislation amending the state insurance code. Most important, however, is the fact that the majority of states have either limited liability to, or at the very least, based the rule of liability upon, situations involving hospitals, which Maryland has already covered by statute. Art. 43, § 556A specifically prevents a hospital from defending a tort suit on the basis of charitable immunity. It provides, however, that if such a hospital is insured for an amount not less than $100,-000, liability is limited to the amount of the policy coverage.

We again restate our opinion that the General Assembly has completely investigated the immunity question, and the present statutes are tangible evidence that the Legislature arrived at

morial Hospital Ass'n, 260 P. 2d 765 (1953). Wisconsin: Widell v. Holy Trinity Catholic Church, 121 N. W. 2d 249 (1963) extended the rule of Kojis v. Doctors Hospital, 107 N. W. 2d 131, 107 N. W. 2d 292 (1961).

15. Howard v. Sisters of Charity of Leavenworth, 193 F. Supp. 191 (D. Mont. 1961); Wittmer v. Letts, 80 N. W. 2d 561 (Iowa 1957); Parker v. Port Huron Hospital, 105 N. W. 2d 1 (Mich. 1960); Rabon v. Rowan Memorial Hospital Inc., 152 S. E. 2d 485 (N. C. 1967); Granger v. Deaconess Hospital of Grand Forks, 138 N. W. 2d 443 (N. D. 1965); Jones v. Hawkes Hospital of Mt. Carmel, 196 N. E. 2d 592 (Ohio 1964); Sessions v. Thomas D. Dee Memorial Hospital Ass'n, 78 P. 2d 645 (Utah 1938); Bishop Randall Hospital v. Hartley, 160 P. 385 (Wyo. 1916).

a solution which it deemed satisfactory. In response to appellant's contention that a judicially created rule of law based on public policy may be judicially repealed, we need only quote a portion of the recent case of *Watkins v. Southcrest Baptist Church,* 399 S. W. 2d 530, 533 (Texas 1966), with which we are in full agreement:

> "The principle of vicarious liability based upon the rule of respondeat superior is essentially a public policy doctrine * * *. [We might very well substitute the trust fund theory for *respondeat superior*.] Courts have applied the rule to certain factual situations and refused to apply it to others. When the application of the doctrine has been determined by court decisions, a change in application may be judicially effected. The situation is not the same as a judicial repeal of a statute for example. However, there is a case for a legislative rather than a judicial change of court created policy rules. Statutes effecting policy changes operate prospectively and are generally adopted following a period of deliberation accompanied by a sufficient and practical notice to all those who might be affected thereby. In fixing classifications of charitable institutions (for example) such as churches, hospitals, schools, etc. and prescribing limits of liability, the legislative power is much more flexible and amenable to particular needs and detailed requirements than is the judicial process."

The appellant also raises the argument that a charitable organization should not be immune from torts committed by its servants, where the charity has failed to use reasonable care in the selection of such servants. Admittedly, several other jurisdictions follow this qualification to the immunity rule.[16] It suf-

---

16. Bader v. United Orthodox Synagogue, 172 A. 2d 192 (Conn. 1961); Humphreys v. McComiskey, 159 So. 2d 380 (La. App. 1964); Rhoda v. Aroostook General Hosp., 226 A. 2d 530 (Me. 1967); Watkins v. Southcrest Baptist Church, 399 S. W. 2d 530 (Texas 1966); Roanoke Hospital Ass'n v. Hayes, 133 S. E. 2d 559 (Va. 1963); Bishop Randall Hospital v. Hartley, 160 P. 385 (Wyo. 1916).

fices to say that this court has never in the past distinguished between an employee's negligence and the "corporate" negligence of the charitable institution in hiring an employee.

As a final proposition, the appellant would have us hold that a charitable institution is liable for torts committed by its servants in the course of non-charitable activities. We are not prepared, nor are we inclined to admit the soundness of this rule. Aside from raising detailed factual investigations and queries as to what is a proprietary as opposed to charitable function (how does one classify the activity of a church bazaar, for example?), we are of the opinion that the facts before us do not indicate the purpose for clearing the land, nor do they shed any light on what was to be constructed there in the future. A resolution of this legal question in light of the dearth of relevant facts before us would be premature on our part.

*Order affirmed, with costs.*